## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                          Crim. No. 18-3499 MV

MANUEL RAMOS-CASTILLO,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Defendant Manuel Ramos-Castillo's Motion to Suppress Evidence Derived as a Result of the Unlawful Search and Seizure of 20270 US Highway 84, Hernandez, New Mexico and Memorandum in Support Thereof [Doc. 45], filed December 27, 2018, and Defendant Ramos-Castillo's Supplemental Argument in Support of Defendant's Motion to Suppress Evidence [Doc. 77], filed July 3, 2019. The government filed Responses [Docs. 49 and 80] on January 24, 2019 and July 18, 2019, respectively. Mr. Ramos-Castillo filed Replies [Docs. 54 and 81] on February 6, 2019 and July 23, 2019, respectively. The Court held an evidentiary hearing on Mr. Ramos-Castillo's Motion to Suppress Evidence [Doc. 45] on June 21, 2019, and the parties filed their closing arguments on July 1, 2019. Docs. 73 and 74. Having reviewed the briefs, testimony, exhibits, relevant law, and being otherwise fully informed, for the reasons set forth below, the Motion to Suppress Evidence [Doc. 45] will be **GRANTED** in part, and the Supplemental Argument in Support of Defendant's Motion to Suppress Evidence [Doc. 77] will be **DENIED**.

## PROCEDURAL HISTORY

On October 23, 2018, Mr. Ramos-Castillo was charged in a one-count Indictment with Possession with Intent to Distribute 1 Kilogram and More of Heroin, in violation of 21 U.S.C. §§

841 (a)(1) and (b)(1)(A). Doc. 20. On December 27, 2018, he filed a Motion to Suppress Evidence based on a search and seizure of his property at 20270 US Highway 84 in Hernandez, New Mexico, including the vehicles parked there. Doc. 45 at 1. The government filed a Response in Opposition on January 24, 2019. Doc. 49. Mr. Ramos-Castillo filed his Reply [Doc. 54] on February 6, 2019, and the Court held an evidentiary hearing on June 21, 2019, during which it heard testimony from Agent Matthew Salcido, a Deportation Officer with Immigration and Customs Enforcement (ICE), Defense Investigator Paula Sanchez-Knudsen, and Defendant Manuel Ramos-Castillo. That same day, Mr. Ramos-Castillo filed an Unopposed Motion for Order to Supplement his Motion to Suppress Evidence [Doc. 71], which the Court granted on July 3, 2019. On July 1, 2019, both parties filed written closing arguments following the hearing on Mr. Ramos-Castillo's Motion to Suppress. Docs. 73 and 74. On July 3, 2019, Mr. Ramos-Castillo filed his Supplemental Argument in Support of his Motion to Suppress Evidence [Doc. 77], in which he brought an argument under *Franks v. Delaware*. The government then filed a Response [Doc. 80] on July 18, 2019, and Mr. Ramos-Castillo filed a Reply [Doc. 81] on July 23, 2019. The Court will first address the supplemental *Franks* argument and then address the remaining suppression issues.

## BACKGROUND

This case concerns the search and seizure of Mr. Ramos-Castillo's property based on a search warrant. The following represents the Court's findings of fact, based on the parties' briefing, the testimony of witnesses at the evidentiary hearing on June 21, 2019, and the exhibits.

On Sunday, September 9, 2018, a Source of Information (SOI) reported walking his/her dog in Alcalde, New Mexico when the dog discovered a package. Doc. 45-1 at 6. The SOI inspected the package and observed that it was a six-by-six inch package wrapped in plastic. *Id*. The SOI unwrapped the package and observed a black substance contained within, which the SOI

believed to be illegal drugs. *Id.* The SOI transported the suspected illegal drugs to the Espanola State Police (NPSP) Office, where an officer advised the SOI to return with the package the following day, which was a Monday. *Id.* The next day, the SOI returned to the NMSP Office and made contact with Lieutenant Chris Valdez, who took custody of the package. *Id.* The SOI advised Lt. Valdez that a male subject came to his/her house late the previous night asking if he/she had found a package wrapped in cellophane, stating that the package belonged to his daughter. *Id.* The SOI then asked the man to leave his/her property. *Id.* Although Lt. Valdez asked the SOI if he/she knew the man's identity, the SOI declined to identify the man. Doc. 49 at 2. However, Lt. Valdez knew that Leon Salazar was the SOI's neighbor, and that Mr. Salazar had previous drug trafficking convictions. *Id.*

Lt. Valdez weighed the suspected illegal drugs and noted a weight of approximately 646 gross grams. Doc. 45-1 at 6. He then transferred the package of suspected heroin to Region III Agent Janice Madrid, who field-tested the suspected drugs, which indicated a positive response for the presence of heroin. *Id.* at 7.

On September 11, 2018, Agent Madrid and NMSP Region III Narcotics Task Force Agent Gabe Trujillo interviewed Leon Salazar at his scheduled probation meeting. Doc. 45 at 3. As of that date, Mr. Salazar had been reporting to the Espanola District Office of the Probation and Parole Division of the New Mexico Corrections Department for mandatory meetings with his Probation Officer (PO) for months. *Id.* at 4. That day, upon his arrival, he was taken into a back room. *Id.* at 4. When his PO left, he was questioned by Agents Madrid and Trujillo. Doc. 49 at 4.

During the questioning, the agents attempted to obtain information regarding the heroin recovered by the SOI. The agents told Mr. Salazar that they were not looking to arrest him, but

rather that they were looking for the "main man." Doc. 77-2 at 12. They attempted to instill fear in Mr. Salazar, telling him that people will be targeting him, referring to his family and his nice car. *Id*. In an attempt to get information, Agent Madrid told him that "there's only going to be one time in your life where the bus comes through and you can pick your seat because the next time the bus comes through, I'm going to assign the seat…I have no problem taxing you both." *Id*. at 13–14. She also warned him that it could potentially go to the U.S. Attorney's Office. *Id*. at 15. She told him that she was not there to promise him anything but that she could "easily forget about [him]." *Id*. at 19. She also told him that they could clear his name, that they could get the money and help him pay off the drugs, and that they "just need[ed] to know facts about how much [he owed] and stuff." *Id*. at 25.

Mr. Salazar eventually admitted that he would sell a "tripa" (or three grams) for $180. *Id*. at 30. He stated he got it from a "young kid" of about 24 or 25 years old at his trailer. *Id*. at 32–33. He said the young man who provided the drugs was the brother of Jesus. *Id*. at 34. He estimated that he was slightly taller than himself and was approximately 130 pounds. *Id*. at 35–36. He stated that his new white Lexus was outside the trailer which he had given as collateral for the $23,000 he owed for the heroin he had received two weeks prior, and that there was also a silver-grey car which he believed was a newer Toyota, as well as a white Chevy and a Civic. *Id*. at 31–32, 36; Doc. 77 at 10. He described the property as one trailer with several rental trailers, with a chicken coop in the front. *Id.* at 39. He stated he did not know where the drugs were kept, but offered to take the Agents by the property. *Id*. at 35, 39.

On September 14, 2018, Mr. Salazar again met with Agents Madrid and Trujillo at the probation office. Doc. 49 at 6. This time, his PO sat in on the interview. Doc. 80 at 9. The Agents showed Mr. Salazar several photographs and he positively identified photographs of Jesus and

Manuel Ramos-Castillo, and stated that they were the individuals he was describing in the September 11 interview. Doc. 49 at 7. However, during that interview he also initially went back on some of what he had revealed to the Agents at the previous meeting. He stated that he wanted to help them but he did not want to get in any more trouble and that he was "innocent." Doc. 80-1 at 7. When Agent Trujillo asked whether the information Mr. Salazar had previously provided was "off," he replied that he would help if he could, and that he was not trying to get into any more trouble. *Id*. Agent Madrid also asked if the previous interview was the only day he was going to tell the truth, and said to him: "Because now you sit here, because he's [the PO] sittin' here, I don't know why, if you're lying because he's in here or what." *Id*. at 11. Mr. Salazar began recanting his statements, saying that he did not get any heroin, and that any heroin he had gotten was three years ago. *Id*. at 17. However, he then returned to his initial version of events, and stated that the heroin that was recovered was obtained from "[t]hat trailer [he] took [them] to." *Id*. at 28. He admitted that he had picked the heroin up about two weeks prior. *Id*. at 30. He said the deal took place in his truck, that he did not go inside the trailer, and that there was no money exchange because he did not have money. *Id*. at 32.

On September 17, 2018 Drug Enforcement Agency (DEA) Special Agent (SA) Christopher Godier filed a sworn affidavit in support of a search warrant for the Subject Residence before United States Magistrate Judge Laura Fashing. Doc. 77-1 at 2. The warrant application was signed and approved by Judge Fashing that same day. *Id*. at 1. The affidavit provided the precise GPS coordinates for the Subject Residence, listed as being on the east side of US Highway 84 in Hernandez, New Mexico. *Id*. at 3 The affidavit described that a package of suspected heroin was found by a SOI and provided to NMSP Lt. Valdez, and that the package field-tested positive for 646 grams of heroin. *Id*. at 6–7. The affidavit summarized Agent Madrid and Trujillo's meeting

with Mr. Salazar on September 11, 2018, and that following the interview, Mr. Salazar traveled with the Agents to point out the Subject Residence as well as the vehicles that he had described would be there, including his white Lexus. *Id*. at 7. It also summarized the September 14, 2018 meeting, in which Mr. Salazar identified photographs of Jesus and Manuel Ramos-Castillo. *Id*. It confirmed that Jesus Ramos-Castillo was a defendant in a fifteen-defendant drug trafficking case where he was convicted of Use of a Telephone to Facilitate a Drug Trafficking Offense, in violation of 21 U.S.C. § 843(b), and Aiding and Abetting, in violation of 18 U.S.C. § 2, was sentenced to 42 months custody, and removed from the United States thereafter. *Id*.

Agent Godier concluded that there was probable cause to believe that evidence of distributing and possessing with intent to distribute heroin would be found at the Subject Residence, and further stated that AUSA Kristopher Houghton reviewed the affidavit and stated that he believed the proposed warrant was "in proper form and is supported by probable cause." *Id*. at 8. The affidavit also included several attachments. Attachment A listed the GPS coordinates and the address of the premises, and stated that "the only premises to be searched is the light blue, green-roofed, single-wide trailer, as well as the yard, and driveway appurtenant to that trailer." *Id*. at 9. It also contained an aerial photograph with a highlighted area outlining the area described, including the trailer, surrounding yard and driveway, and smaller structures within the highlighted area. *Id*. There was also a photograph of a side view of the trailer, and a description of a white Chevy pickup truck and silver Toyota pickup truck to be searched if parked on the premises. *Id*. at 10. Attachment B outlined the items to be seized, to include money, records including ledgers, account books, and other identifying information, customer or dealer lists, telephone and address books, indications of ownership or control of the premises, indications of ownership or control of

the vehicles, cellular phones and bills, financial records, financial instruments, transportation records, and firearms or other dangerous weapons. *Id*. at 11.

Several days later, on September 24, 2018, at approximately 5:20 p.m., Agents Trujillo and Madrid, SA Godier, and other agents executed the search warrant at the Subject Residence, where Mr. Ramos-Castillo was present. Doc. 45 at 10. Mr. Ramos-Castillo was 23 years old at the time, had graduated high school with mostly C's and D's, admitting that "[s]chool was pretty hard for [him]," is a native Spanish speaker with English as his second language, and was employed at Los Alamos National Laboratory as a custodian. Doc. 72 at 167–68. That day was the first time he ever had any contact with law enforcement. *Id*. at 168. There were approximately eight to ten law enforcement officers present, including DEA agents, uniformed NMSP officers, and Region III narcotics agents. Doc. 72 at 16. Most of the federal agents were in plain clothes, although at least one agent, Larry Pantoja, wore a tactical uniform as a SWAT member. *Id*. at 17. Agent Salcido testified that although he wore plain clothes, he wore a tactical vest with police markings on the front and back, and carried both a sidearm and long arm that day. *Id*.

At the Subject Residence, Agent Godier knocked and the door swung open. *Id*. at 18. Agent Salcido testified that once the door is open, they are in a compromised position, so at that point, they went forward with the entry. *Id*. He stated that it was possible that Agent Godier tested the door and it was open, so he pushed it open and the Agents went in, but that he was at the back of the stack and did not recall whether Agent Godier knocked on the door first. *Id*. at 67.

He testified that Agent Godier saw Mr. Ramos-Castillo immediately and gave him verbal commands to show his hands. *Id*. at 20. At that time, Mr. Ramos-Castillo was wearing boxer shorts and was not wearing a shirt. *Id*. at 68. He testified that "it appear[ed] that the Defendant [wasn't] obeying commands." *Id*. at 21. According to Agent Salcido, Mr. Ramos-Castillo failed

to obey the verbal commands and just stood there and yelled back, "You can't be in my house, You need to have a warrant." *Id*. He testified that Mr. Ramos-Castillo was not combative but he was not compliant either. *Id*. Mr. Ramos-Castillo testified that he heard a "boom" and suddenly there were officers inside his home yelling "search warrant" at him, and he just "froze up." *Id*. at 170. He said that the agents approached him immediately and he put his hands up and asked to see the search warrant. *Id*. at 173. Agent Godier then proceeded to "go hands-on" by restraining Mr. Ramos-Castillo and putting him in handcuffs. *Id*. at 21. Agent Salcido could not recall if Agent Godier had a weapon on him. *Id*. However, he testified that he had his weapon drawn and was covering Agent Godier. *Id*. at 21–22. He testified that while Agent Godier attempted to restrain Mr. Ramos-Castillo, Agent Godier fell and his helmet hit the glass portion of a nearby nightstand. *Id*. at 22. He testified that Agent Godier had no choice but to restraint Mr. Ramos-Castillo and take him to the ground, and that they have to restrain everyone in a high-risk narcotics search warrant. *Id*. at 23–24. He stated that despite Mr. Ramos-Castillo not appearing agitated or raising his voice, they had to make a split-second decision. *Id*. at 24. Mr. Ramos-Castillo testified that one of the agents "got [his] arm and he slammed [him], slammed [his] head against the entertainment center" in his room. *Id*. at 174. His head was cut on his forehead and in his hairline, and he sustained a shoulder injury from being slammed against the entertainment center. *Id*. at 174, 177; Def. Exs. H, H-1 He testified that the agent fell on top of him and that he was immediately handcuffed after being slammed to the floor. *Id*. at 174–75. As they handcuffed him, they turned him as his face was in the glass, which caused cuts to his head. *Id*. at 177. Noticing Mr. Ramos-Castillo's cuts from the glass, one of the officers cleaned the blood on his face. *Id*. at 175; *see also* Def. Exs. F, G (depicting a piece of toilet paper with blood near the broken entertainment center). Mr. Ramos-Castillo testified that the blood dripped down his face to his

nose before it was cleaned. *Id*. at 176. He reported that his head was throbbing like a migraine and his shoulder and knee were in pain as well. *Id*.

At that point, Agent Salcido walked past to clear the bathroom. *Id*. at 23. After detaining Mr. Ramos-Castillo immediately upon entering the Subject Residence, Agents Godier and Pantoja picked him up and moved him into the living room to sit on the couch. *Id*. Mr. Ramos-Castillo had several abrasions on his head which were bleeding as a result of being taken to the ground by Agent Godier. *Id*. at 69. He testified that he was handcuffed throughout the encounter behind his back, despite alerting the agents that it was hurting his shoulder. *Id*. at 178.

Agent Salcido testified that Agent Pantoja, an EMT, examined the two small abrasions that were bleeding and verified that they were not significant enough to require Band-Aids. *Id*. at 38. But Mr. Ramos-Castillo testified that Agent Pantoja "looked at" him but did not do any further examination or testing. *Id*. at 178–79. He testified that his head was spinning and throbbing, and his thoughts were racing. *Id*. at 182.

At that point, the agents were questioning Mr. Ramos-Castillo; Agent Salcido estimated that it had not been more than one or two minutes since they began the execution of the search warrant. *Id*. at 26. Mr. Ramos-Castillo asked to see the search warrant, and was told by Agent Godier that it does not arrive that fast. *Id*. at 26–27. Despite asking to see the warrant several times, it was never shown to Mr. Ramos-Castillo. *See* Gov. Ex. 2, 2a. Agent Salcido told Mr. Ramos-Castillo that they were "going to search every little piece of this residence. And the--, and everything around here because that's what the warrant entails." *Id*. at 19. He testified that at the time the warrant was executed, he was not aware exactly what the warrant covered, but had "just the basic knowledge of what was going on." Doc. 72 at 105. He also stated that at the time, they were not asking for permission to search, as they had a warrant, and that it was his understanding

that they had a warrant to search the whole property, so that was their intention. *Id*. at 106. He testified that he was not aware that the warrant did not cover the chicken coop. *Id*. Agent Salcido also testified that he does not know whether the search warrant was ever shown to Mr. Ramos-Castillo, and that he does not know why it was not shown to Mr. Ramos-Castillo when he requested to see it. *Id*. at 121. Mr. Ramos-Castillo testified that at that time he believed that the agents did in fact have a search warrant for the entire property. *Id*. at 184.

Agent Salcido testified that at one point during the questioning of Mr. Ramos-Castillo he asked all agents to leave the room so that it was just him, Agent Godier, and Agent Madrid. Doc. 72 at 29. He stated that having "so many agents around a defendant that's about to give a voluntary statement would lend towards its involuntariness." *Id*. He testified that at some point he dropped his long arm and his vest, and he believed that the other agents also dropped their long arms. *Id*.

Throughout the questioning, Mr. Ramos-Castillo was told that he should just tell the agents where the narcotics were hidden so they would not have to destroy his house and property. Gov. Ex. 2, 2a. Several times throughout the interview he answered that he did not have anything inside his house, which Agent Salcido testified was a clue that there was something hidden somewhere outside the residence. Doc. 72 at 33. Agent Salcido opined that this was a "quasi admission" that there was nothing inside the house but possibly something outside. *Id*. He testified that the conversation took place in a relaxed environment and that no uniformed officers had entered the trailer at that point, and no agents had brandished their firearms. *Id*. at 36–37. However, he also testified that Agent Pantoja had previously been in the trailer and that he was wearing his tactical uniform. *See id*. at 17, 23.

The agents repeatedly asked Mr. Ramos-Castillo where the narcotics were located, and repeatedly told him they would "tear up" his whole property if he did not show them. *See* Gov.

Ex. 2, 2a.  Eventually, he was taken from the couch in his trailer to his Toyota truck outside, where he was seated on the tailgate and the questioning continued.  *Id*.  At one point, Mr. Ramos-Castillo asked the agents if they would tie his shoe, as he was handcuffed, and Agent Madrid responded that his shoe was going to come off, and an unknown uniformed officer then interjected and stated, "It's gonna end up coming off in jail," and they continue with the interrogation.  *Id*. at 31; Doc. 72 at 85.

Agent Salcido testified that after the initial entry, none of the agents had their long rifles; however, he stated that all agents still had their sidearms thereafter including during questioning, including himself, Agent Madrid, Agent Godier, and Sergeant Shelton.  Doc. 72 at 104. Throughout the course of the interrogation, there were 45 different times that the agents asked or demanded that Mr. Ramos-Castillo take them to the drugs.  Def. Ex. T; Doc. 72 at 88–90.  The agents also made a total of 28 statements to Mr. Ramos-Castillo about tearing his property up, destroying his property, or other threats along those lines if he did not show them where the drugs were hidden.  *Id*.; Doc. 72 at 102.  Throughout the questioning, the agents, and Agent Madrid in particular, were very close to Mr. Ramos-Castillo's face.  Doc. 72 at 199.  Eventually, Mr. Ramos-Castillo stated, "I'm f***ed…I'm gonna go to jail anyway, I'm gonna be f***ed with my job…" Gov. Ex. 2, 2a at 15; Doc. 72 at 111.  After over twenty-five minutes of this repeated questioning, Mr. Ramos-Castillo led the officers to the location where the narcotics were stashed, in a cooler in the ground under dirt and plywood inside his chicken coop.  *Id*; Doc. 72 at 53.

The fence to the chicken coop was located approximately 60 feet from Mr. Ramos's trailer. Doc. 72 at 154.  The chicken coop had a gate, was enclosed with chicken wire fencing, and had coops made of plywood, wood, and chicken wire.  Gov. Ex. 4r–v.  The chicken coop has only one entrance, which is through a gate.  Doc. 72 at 139.  There is no fence that encloses both Mr. Ramos-

Castillo's trailer and the chicken coop, and there were no "no trespassing" signs on his property. *Id*. at 146, 212. Mr. Ramos-Castillo guided the agents into the coop and indicated where the narcotics were located, under plastic grates. *Id*. at 52. Inside the cooler, agents located a plastic bag containing approximately one kilogram of heroin. *Id*. at 54. Agent Salcido testified that they did not search any other areas of the coop, but rather went straight to the area to which Mr. Ramos-Castillo directed them. *Id*. at 55.

In the chicken coop, there appeared to be trash from food items, including a soft drink cup, chip bags, alcohol containers, and beer bottles (some of which were still full). *Id*. at 110, 140, 148, 162; Def. Ex. R. Inside the coop, there were also chairs and other items on which people could sit such as buckets and tires. *Id*. at 140, 147–48, 186. Mr. Ramos-Castillo stated that he would go into the chicken coop in the morning and then spend time there in the afternoons, and would sometimes eat lunch there. *Id*. at 186, 209. He stated that he would hang out there with friends on the weekends, having drinks, sitting around and talking. *Id*. He reported spending over two hours there on a daily basis. *Id*. He kept an old air-conditioner—a swamp cooler—in the coop. *Id*. at 187. He testified that the individuals to whom he rented the other trailers on his property knew that they could not go into his chicken coop because it was his area that he had fenced off and gated. *Id*. at 172. He stated that he considers his chickens to be his pets, that he has been raising chickens since the age of 10, and that he would breed them. *Id*. at 183–84, 186.

## SUPPLEMENTAL *FRANKS* ARGUMENT

In Mr. Ramos-Castillo's supplemental *Franks* argument in support of his motion to suppress, he argues that the evidence seized pursuant to the warrant must be suppressed because the affidavit in support of the warrant application contained material omissions and misrepresentations. Doc. 77 at 1. He first argues that the Affiant, Agent Godier, omitted relevant

and material information about the informant, Leon Salazar, including his criminal history and promises made to him by law enforcement. *Id*. at 6–10. He also argues that law enforcement failed to corroborate the information provided by Mr. Salazar. *Id*. at 10–14. Additionally, he argues that the Affiant omitted information regarding Mr. Salazar's September 14, 2018 recantation of statements made on September 11, 2018. *Id*. at 14–15. Finally, Mr. Ramos-Castillo argues that the Good Faith Exception does not apply in this case. *Id*. at 15–17.

In its Response, the government argues that the Court should disregard Mr. Ramos-Castillo's supplemental argument because it is procedurally defective as he failed to request the proper remedy under *Franks*: a hearing. Doc. 80 at 1. The government nevertheless maintains that Mr. Ramos-Castillo has not made the requisite "substantial preliminary showing" for a *Franks* hearing, and further argues that the affidavit still establishes probable cause even if the alleged material omitted information is included. *Id*. The government in turn addresses each of Mr. Ramos-Castillo's claims of omitted information. *Id*. at 6–13.

In his Reply, Mr. Ramos-Castillo requests that the Court hold an evidentiary hearing pursuant to *Franks*, and then suppress all evidence. Doc. 81 at 3. He again argues that the material omissions in the affidavit vitiate probable cause in the warrant. *Id*.

## I. Legal Standard

### a. Franks v. Delaware

In *Franks v. Delaware*, the Supreme Court determined that a defendant may challenge the veracity of a search warrant under the Fourth Amendment under certain circumstances. 438 U.S. 154, 155–56 (1978). First, to merit a hearing, a defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth" was included in the warrant affidavit. *Id*. The Tenth Circuit has held that this rule applies to

omissions as well as affirmative misstatements, if the omissions are "so probative they would vitiate probable cause." *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990) (citing *Stewart v. Donges*, 915 F.2d 572, 582 n. 13 (10th Cir. 1990)). There is a presumption of validity for an affidavit supporting a search warrant. *Franks*, 438 U.S. at 171. Nevertheless, "recklessness may be inferred from omission of fact which are 'clearly critical' to a finding of probable cause." *DeLoach*, 922 F.2d at 622 (citing *Hale v. Fish*, 899 F.2d 390, 400 (5th Cir. 1990)) (citation omitted). However, a challenge to the affidavit must be "more than conclusory":

> There must be allegations of deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of material witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Franks*, 438 U.S. at 171. The veracity inquiry is to focus only on the affiant and not any nongovernmental informant. *Id*. The Court in *Franks* noted that truthfulness in the affidavit does not require that every single fact is "necessarily correct" but rather that "the information put forth is believed or appropriately accepted by the affiant as true." *Id*. at 165. Furthermore, courts have noted that there is no rule requiring the affiant to include "every shred of known information" in a warrant affidavit, and "the omission of a particular detail, without more" is insufficient to meet the requirement under *Franks*. *United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015) (citing *United States v. Colkley*, 899 F.2d 297, 300–01 (4th Cir. 1990)). Furthermore, a "failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth." *Id*. (quoting *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994) (citation and internal quotations omitted)). The Tenth Circuit has noted that the defendant should offer

"*evidence* that the allegations of the affidavit are false" and that speculation alone will not suffice. *United States v. Long*, 774 F.3d 653, 662 (10th Cir. 2014).

Second, if the above requirements are met, and if, when the challenged material is set aside (or the omitted material is considered), the information in the warrant affidavit nonetheless supports a finding of probable cause, no *Franks* evidentiary hearing is required. *Franks*, 438 U.S. at 171–72. However, if without the challenged content (or considering the omitted content) a finding of probable cause is not supported, then the defendant is entitled to a *Franks* hearing under the Fourth and Fourteenth Amendments. *Id*. at 172.

### b. Probable Cause

Probable cause is required to support a search warrant. *United States v. Biglow*, 562 F.3d 1272 (10th Cir. 2009). Probable cause to issue a search warrant exists if the supporting affidavit provides facts sufficient to "lead a prudent person to believe that a search of the described premises would uncover contraband or evidence of a crime." *United States v. Sanchez*, 555 F.3d 901, 914 (10th Cir. 2009) (citing *United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir. 1998)). This requires more than a "mere suspicion" but does not require evidence sufficient to convict. *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000). A magistrate judge who receives a warrant application must determine whether probable cause exists by making a "practical, common-sense decision based on the totality of the circumstances as set forth in the affidavit." *Sanchez*, 555 F.3d at 914. This determination should consider the totality of the circumstances including the "veracity" and "basis of knowledge" of persons supplying information. *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983). No single factor is determinative, and courts may not engage in a "divide-and-conquer" analysis to determine if probable cause existed." *United States v.*

*Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004) (citing *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (stating that the factors may not be considered in isolation from one another)).

The Supreme Court has recognized that "[r]easonable minds frequently may differ" with respect to finding probable cause in an affidavit, but the preference for warrants is "most appropriately effectuated by according 'great deference' to a magistrate's determination." *United States v. Leon*, 468 U.S. 897, 914 (1984) (citation omitted).  Reviewing courts should afford a magistrate's probable cause determination great deference, unless there is no "substantial basis for concluding that probable cause existed." *Danhauer*, 229 F.3d at 1006 (quoting *Rowland*, 145 F.3d at 1204 (quotations omitted)); *see also United States v. Sharbutt*, 120 F. App'x 244, 248 (10th Cir. 2005) ("[A] valid probable cause determination requires only a substantial basis to find that evidence of a crime was probably present in the place to be searched.") (citation omitted).  A substantial basis requires that "[s]ufficient information [] be presented to the magistrate to allow that official to determine probable cause," and the determination "cannot be a mere ratification of the bare conclusions of others." *Leon*, 468 U.S. at 915 (citation omitted).

Furthermore, deference does not preclude an inquiry into whether an officer knowingly or recklessly included false information in the affidavit on which the probable cause determination was based. *Id*. at 914.  Courts must ensure that magistrate judges perform a "'neutral and detached' function and not serve merely as a rubber stamp for the police." *Id*. (quoting *Aguilar v. Texas*, 378 U.S. 108, 111 (1964)).  Nevertheless, magistrate judges are permitted to draw "their own reasonable conclusions" as to the likelihood of evidence being found at a particular place based on the affidavit and the "practical considerations of everyday life." *Biglow*, 562 F.3d at 1280.

### c. Good Faith Exception

Even if the search warrant was not supported by probable cause, the evidence seized as a result of the execution of the search warrant should not be suppressed if the executing officer acted on an objective good-faith belief that the warrant was properly issued. *Danhauer*, 229 F.3d at 1006 (citing *Leon*, 468 U.S. at 922). When a court reviews the reasonableness of an officer's reliance upon a search warrant, it should examine the underlying documents to determine whether they are "devoid of factual support." *Id.* (quoting *United States v. McKneely*, 6 F.3d 1447, 1454 (10th Cir. 1993)). A court should consider "all of the circumstances, assume that the officers have a reasonable knowledge of what the law prohibits, and determine whether the underlying documents are devoid of factual support, not merely whether the facts they contain are legally sufficient." *United States v. Beltran-Lopez*, No. CR 10-2309 LH, 2010 WL 11618908, at *7 (D.N.M. Dec. 6, 2010) (citing *United States v. Tisdale*, 248 F.3d 964, 972 (10th Cir. 2001)). The ultimate question is, under an objective standard, whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. *Id.* (citing *Leon*, 468 U.S. at 922 n.23). Evidence should only be suppressed in "those unusual cases in which exclusion will further the purposes of the exclusionary rule" to deter police misconduct. *United States v. Tuter*, 240 F.3d 1292, 1298–99 (10th Cir. 2001) (citing *Leon*, 468 U.S. at 916, 918).

The Supreme Court has recognized four situations in which an officer would not have reasonable grounds for relying on a warrant that has been issued, in which the good-faith exception to the exclusionary rule would not apply:

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his reckless disregard of the truth. Second, the exception does not apply when the issuing magistrate wholly abandons [her] judicial role. Third, the good-faith exception does not apply when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its

existence entirely unreasonable. Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.

*Id*. at 1299 (citing *Danhauer*, 229 F.3d at 1007) (citations and quotations omitted). The government bears the burden of proving that it was objectively reasonable for the agents to rely on the warrant. *Beltran-Lopez*, 2010 WL 11618908, at *7 (citing *United States v. Cook*, 854 F.2d 371, 373 (10th Cir. 1988)).

## II.     Analysis

### a.     Franks and Probable Cause

Mr. Ramos-Castillo argues that the affiant omitted relevant and material information about Mr. Salazar, a "single criminal informant" whose statements were not corroborated, that would have vitiated probable cause. Doc. 77 at 6. He argues that Mr. Salazar is inherently unreliable and the affidavit failed to set forth information regarding any corroboration. *Id*. at 7. First, he argues that law enforcement failed to include information about Mr. Salazar's criminal history. *Id*. at 7–8. He also argues that law enforcement made "numerous promises" to Mr. Salazar, which were also not included in the affidavit. *Id*. at 9. He asserts that the Affiant's failure to include information about Mr. Salazar in the affidavit precluded the issuing magistrate judge from having a "substantial basis" for issuing the warrant. *Id*. at 12. He argues that other than corroborating the presence of vehicles at the residence, law enforcement did nothing to corroborate any of the allegations; they failed to conduct any controlled purchases, did not conduct any independent investigation, and did not otherwise confirm that Mr. Ramos-Castillo resided at the property. *Id*. at 13. Finally, Mr. Ramos-Castillo argues that in Mr. Salazar's September 14, 2018 interview, he recanted the statement he provided on September 11, 2018 about how he had obtained the narcotics and the timeframe. *Id*. at 14. This recantation was omitted from the affidavit. *Id*. at 15.

In response, the government first argues that the affidavit did state that Mr. Salazar admitted to possessing a large quantity of heroin with intent to distribute while he was on probation. Doc. 80 at 6. It argues that it is unlikely that Judge Fashing's finding of probable cause would have changed if she learned that he also had prior drug convictions. *Id*. Second, the government notes that SA Godier made clear in the affidavit that Mr. Salazar admitted on September 11, 2018 that over 600 grams of heroin belonged to him, yet he was not arrested, thus providing Judge Fashing sufficient information to conclude that Mr. Salazar may have been providing information about the source of supply of this heroin for his own leniency. *Id*. at 7–8. Next, the government outlines the ways in which law enforcement corroborated Mr. Salazar's statements: they weighed and tested the heroin, they spoke to Mr. Salazar's neighbor, they interviewed Mr. Salazar on September 11, they drove with Mr. Salazar to Mr. Ramos-Castillo's trailer and verified his description and the presence of the vehicles, they verified Jesus Ramos-Castillo's criminal history, and they pulled photographs of Mr. Ramos-Castillo and Jesus Ramos-Castillo that Mr. Salazar identified at a follow-up meeting on September 14. *Id*. at 8. Finally, the government argues that Mr. Salazar's initial recantation of his September 11 statements during the September 14 interview can easily be explained by the presence of his PO at the second interview. *Id*. at 9. The government suggests that he likely feared that his admissions would result in a probation violation so he initially described the heroin and his debt to Mr. Ramos-Castillo as something that occurred three years prior. *Id*. However, because he eventually conceded and confirmed the truth of his September 11 statements, and those facts were corroborated, there was no need to relay that information to Judge Fashing in the affidavit . *Id*. at 9–10.

Mr. Ramos-Castillo then argued that the warrant affidavit did not contain an accurate representation of Mr. Salazar's extensive criminal record so there was insufficient proof of his

reliability to establish a substantial basis. Doc. 81 at 4. He argues that the affidavit fails to show Mr. Salazar's reliability, veracity, and basis of knowledge, required for an informant. *Id*. at 5. He also argues that the information that was corroborated was readily observable, and was dated as several weeks had elapsed. *Id*. He argues that the failure to include the promises made to Mr. Salazar further demonstrate the reckless omissions in the affidavit, and also suggests that Agent Godier had a duty to investigate further into the discrepancies between Mr. Salazar's statements on the two different dates. *Id*. at 7–9.

In this case, as Mr. Ramos-Castillo alleges that material information was omitted from the affidavit, the question is whether, had that information been included, the magistrate judge would have had a substantial basis to find probable cause. The Court finds that the magistrate judge had a substantial basis for concluding that there was probable cause in the warrant affidavit, and that had the omitted information been included in the affidavit, probable cause would not have been vitiated.

First, with respect to criminal history, courts should look at whether the magistrate judge would still have found probable cause even if the affidavit had discussed the informant's criminal history in more detail. *United States v. Morin*, 188 F.App'x 709, 712 (10th Cir. 2006) (citing *United States v. Avery*, 295 F.3d 1158, 1168 (10th Cir. 2002)). Regarding Mr. Salazar's criminal history, the affidavit did outline that Mr. Salazar had a previously scheduled meeting with his PO on September 11, he admitted that the recovered heroin belonged to him and that he traveled to a neighbor's residence in an attempt to recover the heroin, stated that he had paid $23,000 for the heroin and that he had given his white Lexus as collateral to the supplier, and admitted that he was selling heroin and would charge $180.00 per "tripa," or three grams. *See* Doc. 77-1 at 7. The Court finds that this information as to Mr. Salazar provided the magistrate judge sufficient

background and context to assess the reliability of the information he provided to law enforcement. Given the information that was included and his admissions, the Court does not find that detailing additional prior drug-related charges or his history of traffic violations (*see* doc. 77-3) would have provided critical information about his history that would change the magistrate's conclusion as to the existence of probable cause.

Second, as to Mr. Ramos-Castillo's argument that Agent Godier omitted material information by failing to include law enforcement's numerous promises to Mr. Salazar, the Court finds that the failure to explicitly include this information does not amount to material omission that would vitiate probable cause. Mr. Ramos-Castillo points to *Williamson v. United States*, which states that "a person arrested in incriminating circumstances has a strong incentive to shift blame or downplay his own role in comparison with that of others" in hopes of leniency in exchange for cooperation. 512 U.S. 594, 607–08 (1994). However, Mr. Salazar was not arrested here, but rather was interviewed when he arrived for a meeting with his PO.

Furthermore, the Tenth Circuit has noted that judges issuing search warrants "often know, even without an explicit discussion of criminal history, that many confidential informants suffer from generally unsavory character and may only be assisting police to avoid prosecution for their own crimes." *Morin*, 188 F.App'x at 712 (quoting *Avery*, 295 F.3d at 1168). Given the information provided about Mr. Salazar's admissions and that there was no indication in the affidavit that he was arrested following his interview, it is unlikely that any explicit discussion of promises made by law enforcement would alter the calculus of the magistrate judge's finding of probable cause. The court in *Morin* determined that the affidavit's failure to provide a thorough recitation of the informant's background did not impair the substantial basis for the issuing judge's probable cause determination because the judge was presumed to have background knowledge

about confidential informants, and the affidavit alerted to the judge as to the informant's drug use and past drug purchase, which could imply cooperation for self-serving reasons. *Id.* Similarly here, despite any omissions as to Mr. Salazar's criminal background or promises he was made by law enforcement, there was nevertheless a substantial basis for Judge Fashing to determine that probable cause existed, which would not likely have changed had that information been included.

Mr. Ramos-Castillo argues that a magistrate judge "must be given 'all the facts and circumstances' regarding the person supplying the hearsay information." Doc. 81 at 6 (citing *United States v. Kennedy*, 131 F.3d 1371, 1377–78 (10th Cir. 1997)). However, stating that a magistrate judge must given all the facts and circumstances is a mischaracterization or misapprehension of the rule articulated by the Tenth Circuit. Rather, in *Kennedy*, the court stated:

> A magistrate judge's task in determining whether probable cause exists to support a search warrant "is simply to make a practical, common-sense decision whether, *given all the facts and circumstances set forth in the affidavit before him*, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* (citing *Gates*, 462 U.S. at 238) (emphasis added). Therefore, it is not that a magistrate judge is required to be presented with all the facts and circumstances regarding the informant, but rather that the magistrate judge is to make a practical and common-sense determination based on the information that has been provided. *See also Tanguay*, 787 F.3d at 49 (citing *Colkley*, 899 F.2d at 300–01) ("Because there is no requirement that every shred of known information be included in a warrant affidavit, the omission of a particular detail, without more, is not enough to satisfy the mens rea element of the *Franks* test."). The Court finds that sufficient information regarding Mr. Salazar's background and circumstances were provided to Judge Fashing in the affidavit in this case.

Mr. Ramos-Castillo's third argument is that law enforcement failed to corroborate the information provided by Mr. Salazar. Doc. 77 at 10. The government responds with six ways in which law enforcement corroborated the information. *See* Doc. 80 at 8 (they weighed and tested the heroin, they spoke to Mr. Salazar's neighbor, they interviewed Mr. Salazar on September 11, they drove with Mr. Salazar to Mr. Ramos-Castillo's trailer and verified his description and the presence of the vehicles, they verified Jesus Ramos-Castillo's criminal history, and they pulled photographs of Mr. Ramos-Castillo and Jesus Ramos-Castillo that Mr. Salazar identified at a follow-up meeting on September 14). Furthermore, the government notes that Mr. Salazar made statements against his own penal interest: he purchased heroin, he intended to sell the heroin, and he left his own vehicle at Mr. Ramos-Castillo's residence as collateral for the $23,000 he owed for the heroin. *Id*. at 9.

Mr. Ramos-Castillo relies on *Tuter*, where the Tenth Circuit held that the "minimal corroboration of innocent, readily observable facts" was insufficient to corroborate the information provided by the tipster. 240 F.3d at 1298. However, the "readily observable facts" in that case were provided by an anonymous, unknown caller on a nationwide hotline. *Id*. at 1294. The court noted that the investigating agent had no reason to suspect illegal conduct and the suspicion "arose not from [his] own observations but solely from a call made from an unknown location by an unknown caller." *Id*. at 1297 (quoting *Florida v. J.L.*, 529 U.S. 266, 268, 270 (2000)). Generally, corroboration of information provided by an informant is needed to establish the informant's veracity or reliability. *See Danhauer*, 229 F.3d at 1006 ("When there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the information.") (citation omitted). In this case, the information was not provided by an anonymous caller, but rather by an individual for whom law enforcement had sufficient information that they

could assess his veracity and reliability. Furthermore, the information provided was not merely readily observable facts as in *Tuter*; here, Mr. Salazar described to law enforcement the appearance of the trailer and the cars that would be parked outside, including his own vehicle. In addition, they were able to corroborate other information provided by Mr. Salazar by following up with his neighbor and checking the criminal history of Jesus Ramos-Castillo.

Furthermore, a New Mexico Supplemental Report documenting the investigation of Mr. Ramos-Castillo details the surveillance that was conducted on his residence on September 13, 14, 17, 18, 19, 20, and 22 of 2018. Doc. 80-2 at 2–4. The report indicates that on September 20, an individual drove onto the property in a silver hatchback that had previously been observed on the property on September 14. *Id.* The driver and sole occupant of the vehicle was positively identified as Mr. Ramos-Castillo, who entered the property of the Subject Residence and was observed entering the mobile home.[1] *Id.* at 4. Accordingly, the Court finds that law enforcement's corroboration of the information provided by Mr. Salazar was sufficient to provide a substantial basis for a finding of probable cause to support a search warrant at the subject residence.

Finally, Mr. Ramos-Castillo argues that Mr. Salazar's September 14 recantation of his September 11 statements vitiates probable cause. Doc. 77 at 14. He cites *Stewart*, where the Tenth Circuit stated, "we can conceive of few omissions which would be more material than the failure to disclose that the main complainant had recanted his testimony and confessed it was a fabrication." 915 F.3d at 583. The government contends that Mr. Salazar's inconsistent statements could be attributed to the fact that his PO sat in on the September 14 interview so he likely feared

---

[1] The Court realizes that this information was not included in the affidavit as some of the surveillance, including the observation of Mr. Ramos-Castillo arriving at and entering the Subject Residence, took place after the warrant application was submitted and the warrant was issued. The Court merely includes this information as additional evidence that this is not a scenario where law enforcement officers fully failed to corroborate an informant's information.

that his admissions would lead to a probation violation. Doc. 80 at 9. Because he eventually returned to the same facts he provided on September 11, and that information was corroborated, the government argues that there was no need to relay the initial recantation to Judge Fashing. *Id*. at 10.

The Court finds that any inconsistencies between Mr. Salazar's statements on the two dates are not sufficient to vitiate probable cause. Mr. Salazar did express hesitation about providing information during the September 14 interview. He told the agents that he wanted to help but he did not want to get in any more trouble, and stated, "if I sold drugs, if I went back to that life, like, my probation would be…" Doc. 80-1 at 8. Agent Madrid later speculated that Mr. Salazar was failing to tell the truth because his PO was present: "cuz that was the only day you sat there and you were honest about (UI). Because now you sit here, because he's sittin' here, I don't know why, if you're lying because he's in here or what." *Id*. at 11. Mr. Salazar said that he picked up heroin three years ago, *id*. at 18, but then admitted that it was two weeks prior. *Id*. at 30. He also admitted that he got the heroin at the trailer where he had taken the agents several days prior, and described how the transaction took place outside of the residence. *Id*. at 28, 31–32. Because Mr. Salazar's statements on September 14 ultimately aligned with those provided on September 11, the Court does not find that the failure to include his initial recantation of his statements, provided the context of the second interview, was a material omission. This is not a case where he "recanted his testimony and confessed it was a fabrication." *Stewart*, 915 F.2d at 583.

To warrant a *Franks* hearing, there must be allegations of deliberate falsehood or reckless disregard for the truth as to information that was included in or omitted from an affidavit in support of a warrant. *Franks*, 438 U.S. at 171. There is no requirement that an affiant include every shred of evidence known, and an omission, without more, is insufficient to meet the requirement for a

hearing. *Tanguay*, 787 F.3d at 49. The Tenth Circuit has held that "*Franks* does not extend to immaterial omissions." *Stewart*, 915 F.2d at 583.

The Court finds that the omissions with respect to Mr. Salazar's criminal history, promises made to him, and the inconsistencies in his statements do not vitiate probable cause. Any failure by Agent Godier to more fully investigate the information he had does not rise to the level of knowing or reckless disregard for the truth. *See Tanguay*, 787 F.3d at 49. Furthermore, the Court finds that there was sufficient corroboration by law enforcement of the information provided by Mr. Salazar. Accordingly, Mr. Ramos-Castillo has failed to make a substantial preliminary showing to merit a hearing under *Franks*. *See* 438 U.S. at 155–56. The Court further finds that even if he met the first requirement under *Franks*, if the omitted information is considered, there is nonetheless still sufficient information to support a finding of probable cause, and he is not entitled to a *Franks* hearing. *See id*. at 171–72.

### b. Good Faith Exception

Having found that there was probable cause in the affidavit in support of the search warrant, there is no need for the Court to address Mr. Ramos-Castillo's argument that the good-faith exception to the warrant requirement does not apply. *See Leon*, 468 U.S. at 922. The search warrant was properly issued based on the affidavit, which was supported by probable cause.

### MOTION TO SUPPRESS

Mr. Ramos-Castillo makes three main arguments in his Motion to Suppress: (1) the chicken coop was outside of the scope of the search warrant and law enforcement did not have consent to search it; (2) the search of the Subject Residence was unlawful because the affidavit failed to establish probable cause; and (3) the good-faith exception to the exclusionary rule does not apply, so all evidence seized must be suppressed. Doc. 45. The government, in its Response, maintains

that the officers lawfully searched the subject residence pursuant to a valid search warrant supported by probable cause, Mr. Ramos-Castillo's statements were voluntarily made pursuant to *Miranda* warnings, and the chicken coop qualifies as an open field for which neither a search warrant nor consent was required. Doc. 49. The government also argues that even if a search warrant was needed to search the chicken coop, suppression of the evidence recovered from the coop would not be warranted because the evidence would have inevitably been discovered. *Id*. at 29. In his Reply, Mr. Ramos-Castillo offers substantially the same arguments he made in his Motion, and also argues that the chicken coop was part of his home's curtilage, and not subject to the open fields exception. Doc. 54 at 17. He also contends that the inevitable discovery doctrine is not applicable in this case because without the violation to his constitutional rights, the government would not have been able to discover the evidence through another independent lawful means. *Id*. at 20–25.

The Court will first address Mr. Ramos-Castillo's probable cause arguments to the extent that it has not already done so in the *Franks* discussion. *See supra* pp. 18–26.

## I. Probable Cause

Mr. Ramos-Castillo argues that the warrant that was issued for the Subject Residence lacked sufficient probable cause to believe contraband or evidence of a crime would be found at the time of the search. Doc. 73 at 16. He argues that the warrant failed to establish a nexus between the criminal activity and the place to be searched, relied on stale information, and relied on information that was uncorroborated and unreliable. *Id*. at 15–18; Doc. 45 at 20–34. The government maintains that probable cause was supported by the four corners of the search warrant. Doc. 74 at 2. The government argues that a substantial basis existed for Judge Fashing's finding

of probable cause in the affidavit and that even if the search warrant lacked probable cause, the good-faith exception would apply.  Doc. 49 at 9–20.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  *Davis v. United States*, 564 U.S. 229, 236 (2011).  A violation of this right may result in the exclusion or suppression of evidence; however, exclusion is not a "personal constitutional right" and it is not designed to "redress the injury."  *Id*. (citation omitted).  Rather, the exclusionary rule's "sole purpose" is to deter future Fourth Amendment violations.  *Id*. at 236–37; *see also Leon*, 468 U.S. at 906 ("The rule thus operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'") (citation omitted); *United States v. Otero*, 563 F.3d 1127, 1133 (10th Cir. 2009) ("As the Supreme Court recently reemphasized, the exclusionary rule is a judicially-fashioned super-compensatory remedy whose focus is not on restoring the victim to his rightful position but rather on general deterrence.") (citing *Herring v. United States*, 555 U.S. 135, 129 S.Ct. 695, 699–700 (2009)).

For a warrant authorizing the government's search of an individual's residence, probable cause is required.  *Biglow*, 562 F.3d 1272 at 1275 (10th Cir. 2009).  Probable cause to issue a search warrant exists if the supporting affidavit provides facts sufficient to "lead a prudent person to believe that a search of the described premises would uncover contraband or evidence of a crime."  *Sanchez*, 555 F.3d at 914 (citation omitted).  This requires more than a "mere suspicion," but does not require evidence sufficient to convict."  *Danhauer*, 229 F.3d at 1005.  A magistrate judge who receives a warrant application must make a "practical, common-sense decision based on the totality of the circumstances as set forth in the affidavit."  *Sanchez*, 555 F.3d at 914.  This

determination is to be made using a totality of the circumstances analysis, including the "veracity" and "basis of knowledge" of persons supplying the information. *Gates*, 462 U.S at 238–39. No single factor is determinative, and courts may not engage in a "divide and conquer" analysis to determine if probable cause existed." *Valenzuela*, 365 F.3d at 897 (citation omitted). In other words, the factors may not be considered in isolation from each other. *Arvizu*, 534 U.S. at 274. Nevertheless, there must be sufficient information for the magistrate to conclude that probable cause exists, and the warrant cannot be a "mere ratification of the bare conclusions of others." *United States v. Cooper*, 654 F.3d 1104, 1124 (10th Cir. 2011).

The Supreme Court has recognized that "[r]easonable minds may frequently differ" regarding probable cause in a particular affidavit, but the preference for warrants is "most appropriately effectuated by according 'great deference' to a magistrate's determination." *Leon*, 468 U.S. at 914 (citation omitted). However, there are some boundaries to the deference accorded to magistrate judges. A magistrate's probable cause determination should be afforded great deference unless there is "no substantial basis for concluding that probable cause existed." *Sanchez*, 555 F.3d at 914 (citing *Danhauer*, 229 F.3d at 1006); *see also Sharbutt*, 120 F.App'x at 248 ("A valid probable cause determination requires only a substantial basis to find that evidence of a crime was probably present in the place to be searched.") (citation omitted).

A substantial basis requires that "[s]ufficient information [] be presented to the magistrate to allow that official to determine probable cause," and the determination "cannot be a mere ratification of the bare conclusions of others." *Leon*. 468 U.S. at 915 (citation omitted). Moreover, courts must ensure that magistrate judges perform a "neutral and detached function and not serve merely as a rubber stamp for the police." *Id*. at 914 (citing *Aguilar v. Texas*, 378 U.S. 108, 111 (1964)) (internal quotations omitted). Nevertheless, magistrate judges are permitted to draw "their

own reasonable conclusions" as to the likelihood of evidence being found at a particular place based on the affidavit and the "practical considerations of everyday life." *Biglow*, 562 F.3d at 1280.

Probable cause "undoubtedly requires a nexus" linking the suspected criminal activity to the location to be searched. *United States v. Corral-Corral*, 899 F.2d 927, 937 (10th Cir. 1990). In fact, the Tenth Circuit has identified non-exclusive considerations for a probable cause inquiry where the affiant relies on information from an informant or witness: "(1) the reliability of the informer, (2) the timeliness of the informer's allegations, and (3) the nexus between the item to be seized and the place to be searched." *United States v. Knox*, 883 F.3d 1262, 1275 (10th Cir. 2018) (citation omitted). A totality of the circumstances test is used to determine whether probable cause exists when the information is based on a confidential informant or an anonymous tip. *Tuter*, 240 F.3d at 1295. The Court will address each of these factors in turn.

### a. Reliability

The Tenth Circuit has recently noted that the most powerful basis of knowledge of an informant is personal knowledge of an alleged wrongdoing. *Knox*, 883 F.3d at 1275. If there is sufficient independent corroboration of the informant's information, then the informant's veracity need not be established. *Danhauer*, 229 F.3d at 1006. Corroboration of non-predictive information alone is insufficient to confirm the reliability of an anonymous informant. *Knox*, 883 F.3d at 1276 (citing *Tuter*, 240 F.3d at 1297).

Mr. Ramos-Castillo argues that Mr. Salazar, the source of information in the affidavit, is inherently unreliable and was motivated by his own self-interest, and maintains that law enforcement failed to corroborate his information. Doc. 45 at 29–29. He argues that law enforcement failed to include Mr. Salazar's "substantial criminal history" in the affidavit "in any

way." *Id*. Mr. Salazar has three drug-related convictions from 2015, which were not included in the affidavit. *Id*. at 29–30. Mr. Ramos-Castillo also maintains that law enforcement made "numerous promises" to Mr. Salazar in exchange for information about his source of heroin, which was also not included in the affidavit. *Id*. at 30. The government argues that the affidavit provided Judge Fashing a clear view of Mr. Salazar as a drug-trafficker who was on probation. Doc. 49 at 12.

The government also compares this case to *Sharbutt*, where the affidavit included information about the informant's arrest on a felony warrant, the methamphetamine found at her residence, and her description of her previous purchases of methamphetamine. 120 F.App'x at 248. In that case, the information excluded from the affidavit consisted of the informant's lack of history regarding providing reliable information, a prior drug offense conviction, and other contraband found at her residence besides the methamphetamine, including firearms, drug paraphernalia, and marijuana. Doc. 49 at 15. Nevertheless, the Tenth Circuit found that nothing in the record indicated that the detective's omission of the additional information was intentional, reckless, or material, that the magistrate was aware of the informant's criminal background and drug use, and that it was unlikely that the magistrate judge would have found the possession of other contraband material to any reliability determination already made. *Sharbutt*, 120 F.App'x at 249.

The Court has already substantially addressed this issue, and has found that probable cause was present in the affidavit for the warrant application and that the warrant was properly issued. *See supra* pp. 18–26. While some of the information relied upon in the agents' corroboration here was certainly predictive, the informant in this case, Mr. Salazar, was not an anonymous tipper. The agents were able to corroborate much of the information that he provided, including the

presence of his white Lexus as well as the two trucks in the driveway. The Tenth Circuit has acknowledged that "[a]lmost anyone can describe the residents of, and vehicles at, a particular home without any special knowledge of what goes on inside the home." *Tuter* 240 F.3d at 1297. Nevertheless, law enforcement did have more knowledge about Mr. Salazar and his background, as well as the tangible evidence of the heroin that was recovered.

In *Danhauer*, the informant's identity was known to the investigating officer but was not revealed to the Detective, based on the informant's fear for his/her personal safety. 229 F.3d at 1004. The police corroborated the physical description of the residence, conducted a records check to confirm that the Danhauers lived at the residence, and observed one of the Danhauers going between the house and the garage, where the alleged methamphetamine laboratory was located. *Id*. at 1006. The court stated that the detective made "little effort" to link the methamphetamine to the residence, and accordingly found that such a nebulous connection was insufficient to give the magistrate a substantial basis for concluding that probable cause existed *Id*.

Here, the Affiant, Agent Godier, was aware of Mr. Salazar's identity. As the government noted, Mr. Salazar made statements against his own penal interest: he purchased heroin, he intended to sell the heroin, and he left his own vehicle at Mr. Ramos-Castillo's residence as collateral for the $23,000 he owed for the heroin, and law enforcement was able to corroborate the information provided, including with another individual who seemingly had no stake in the matter (Mr. Salazar's neighbor). Doc. 80 at 9. The Court has already determined that sufficient information was corroborated and enough information was provided to Judge Fashing through the affidavit to provide a substantial basis for her finding of probable cause, and for her to determine the reliability of the information in the affidavit. *See supra* pp. 18–26.

### b. Timeliness

Mr. Ramos-Castillo argues that Mr. Salazar's allegations were stale by the time the search warrant was issued. Doc. 45 at 22. Mr. Salazar stated that he had received heroin from Mr. Ramos-Castillo approximately two weeks earlier. *Id.* Accordingly, he argues that the allegations, without more timely investigation, provided no evidence that controlled substances or firearms would be at the Subject Residence at the time the warrant was issued. *Id.* at 34. The government argues that defense counsel's argument that a three week delay renders the information stale has been rejected by the Tenth Circuit, citing *United States v. Marquez*, No. 90-1230, 1991 WL 145264, at *2 ("We also do not agree, as argued ty Marquez, that this statement made three weeks before the issuance of the warrant, was too stale to establish probable cause for Marquez's continued possession of the gun.") and *United States v. Miles*, 772 F.2d 613, 616 (10th Cir. 1985) (finding an 18-day delay between the development of evidence and the date of the affidavit did not render the evidence stale for probable cause purposes). Doc. 49 at 12 n.8.

"Probable cause cannot be based on stale information that no longer suggests the items to be sought will be found in the place to be searched." *United State v. Snow*, 919 F.2d 1458, 1459 (10th Cir. 1990) (citation omitted). Whether information is stale is dependent on "the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *Id.* at 1460. In *Snow*, the Tenth Circuit found that a five-week FBI investigation did not render the information stale because "ongoing and continues activity makes the passage of time less critical." *Id.* The court also noted that some of the items sought, such as records, were the type that would likely be kept for some time given the nature of the criminal activities (conspiracy to defraud the United States). *Id.* (citing *United States v. Williams*, 897 F.2d 1034, 1039 (10th Cir. 1990)).

In this case, Mr. Salazar told agents that he had obtained the heroin approximately two weeks prior to the date on which they interrogated him. *See* Doc. 77-2 at 39. Here, law enforcement officers also sought items that would likely be kept for some time, such as drug customer lists, notes with contact information, records of accounts receivable, telephone and address books, other financial records, and other records and ledgers related to sale and distribution, as outlined in Attachment B of the affidavit. Doc. 77-1 at 11. While it is possible that drugs could be disposed of after two weeks, some of the items to be seized in this search warrant, as in *Snow*, "were of the type that would be kept for some time given the nature of defendant's activities." 919 F.2d at 1460 (citation omitted).

Mr. Ramos-Castillo relies on *United States v. Bautista-Meza*, where the investigation took place over the course of several months and law enforcement received information about narcotics sales from several confidential informants and then set up a controlled buy. Doc. 73 at 17–18. However, in that case the first tip came to law enforcement in late 2012, and several others came in early 2013. *Bautista-Meza*, 2014 WL 2158408, at *4 (D. Kan. May 23, 2014). Law enforcement set up a controlled buy in late April of 2013 and continued surveillance on May 6 and 7 of 2013. *Id*. However, the defendant's identity was not confirmed until September 19, 2013, and he was arrested in a traffic stop on September 25, 2013. *Id*. Those facts are not analogous to the instant case, where Mr. Salazar first provided information to law enforcement on September 11, 2018, met with law enforcement again on September 14, 2018, and law enforcement conducted surveillance on the Subject Residence on September 13, 14, 17, 18, 19, 20, and 22 of 2018. *See* Doc. 80-2 at 2–4. This is not a case where law enforcement received information and waited months or even weeks before acting on it.

### c. Nexus

Mr. Ramos-Castillo argues that the warrant that was issued for the Subject Residence lacked sufficient probable cause to believe contraband or evidence of a crime would be found there at the time of the search. Doc. 73 at 16. He states that the warrant sets forth background information about Mr. Salazar's statements that he picked up narcotics from that residence in late August 2018, but argues that "little to no corroboration was set forth in the warrant affidavit." *Id*. He argues that the affidavit provided only bare-bones information and thus did not establish a nexus between the items to be seized and the place to be searched. Doc. 45 at 22. He argues that the affidavit provides no evidence of any effort on the part of law enforcement to conduct an independent investigation to establish a nexus for probable cause, particularly connecting the Subject Residence or Mr. Ramos-Castillo to the criminal activity. *Id*. at 23, 26.

The government argues that the affidavit is not required to contain direct evidence or personal knowledge in order to establish a nexus. Doc. 49 at 11 (citing *United States v. Hargus*, 128 F.3d 1358, 1362 (10th Cir. 1997)). The government further argues that the agents did corroborate Mr. Salazar's information in several important ways, which have already been addressed. *Id*. at 12; *See supra* pp. 18–26.

In *Danhauer*, the Tenth Circuit found that the affidavit failed to allege facts sufficient for probable cause. 229 F.3d at 1006. In that case, a confidential informant notified law enforcement that two men were cooking methamphetamine in the garage on the Danhauer property. *Id*. at 1004. The detective verified the physical description of the property, confirmed by a records check that the two men occupied the premises, observed one of the men going back and forth between the home and the garage, and researched both suspects' criminal backgrounds. *Id*. The affidavit contained "repetitive statements regarding the physical description of the Danhauer residence,"

the identity of the occupants, and the criminal histories of the two men. *Id.* However, it did not include the informant's basis of knowledge or verification of the informant's allegation that the Danhauers were manufacturing methamphetamine. *Id.* The Tenth Circuit stated that an affidavit containing "repetitive and tenuous facts does not provide a magistrate with a sufficient basis for drawing a reasonable inference that a search would uncover evidence of criminal activity." *Id.*

Mr. Ramos-Castillo argues that law enforcement in *Danhauer* conducted significantly more investigation than they did in the instant case, and yet the court still found the information in the affidavit to be insufficient. Doc. 45 at 25. The government, however, distinguishes *Danhauer* from the instant case because in *Danhauer*, the informant was confidential, the affidavit did not explain how the informant knew the pertinent information, and the affidavit did not adequately corroborate the informant's information. Doc. 49 at 12. Here, the government argues, the informant is identified as Mr. Salazar, the affidavit explains his basis of knowledge, and the affidavit shows the ways in which his information was corroborated, including the discovery of heroin near his home, the presence of his white Lexus at the Subject Residence, and the criminal history and location of Mr. Ramos-Castillo's brother, Jesus. The Court agrees with the government.

The government contends that this case is more similar to *Sharbutt*, where the Tenth Circuit upheld the district court's finding of probable cause based on an affidavit which included information from an informant about purchasing methamphetamine from Mr. Sharbutt at his residence on multiple occasions. Doc. 49 at 14. The affidavit in that case stated that the informant was arrested on a felony warrant, frequently purchased methamphetamine from Mr. Sharbutt at his residence, saw several ounces of methamphetamine at that residence on different occasions, sometimes saw him weigh the methamphetamine on a scale, purchased an "eight-ball" from him

only two days prior, and possessed methamphetamine in her home at the time of her arrest. *Sharbutt*, 120 F.App'x at 248. The detective in that case also outlined his extensive training and experience, and his professional opinion on what evidence would be found at Mr. Sharbutt's residence. *Id*. at 248–49.

While in the instant case there is no information in the affidavit regarding the number of times Mr. Salazar purchased heroin from Mr. Ramos-Castillo, as with the informant in *Sharbutt*, his knowledge was based on his personal experience from purchasing the narcotics at Mr. Ramos-Castillo's home. There was no confidential informant in the instant case and the affidavit makes clear not only who provided the information but also his basis of knowledge. The only information provided under the "Additional Investigative Effort" section in the affidavit concerns the September 14, 2018 interview and photo identification by Mr. Salazar of Mr. Ramos-Castillo and Jesus, and information regarding Jesus' criminal history. Doc. 45-1 at 7. Nevertheless, Agent Godier described his professional experience and his opinions based on that experience, including what he expected to find at the Subject Residence. *Id*. at 4–6. The Tenth Circuit has acknowledged that an affiant's experience and expertise may be considered in the magistrate judge's probable cause determination. *United States v. Soussi*, 29 F.3d 565, 569 (10th Cir. 1994) (citation omitted). Magistrate judges may rely on opinions of law enforcement officers as to where contraband or evidence may be kept, and the Tenth Circuit has stated that sometimes the evidence linking an illegal activity to a suspect's home has "come in the form of an affiant officer's statement that certain evidence—in his or her professional experience—is likely to be found in a defendant's residence." *Biglow* 562 F.3d at 1279 (citing *Sanchez*, 555 F.3d at 913). The Tenth Circuit has further held that an affiant officer is not required to "draw an explicit connection between a suspect's activities and his residence for a Fourth Amendment nexus to exist." *Id*.

In this case, the affidavit explicitly connects the heroin that was recovered to Mr. Ramos-Castillo and the Subject Residence, as it contains Mr. Salazar's admissions that he obtained the heroin from Mr. Ramos-Castillo at the Subject Residence approximately two weeks prior and that his vehicle was parked at the Subject Residence as collateral. Doc. 45-1 at 7. He additionally provided a description of the Subject Residence and traveled with the agents to point out the Subject Residence. *Id*. Accordingly, the Court finds that a sufficient nexus existed for a finding of probable cause connecting the items to be seized and the place to be searched.

### d. Probable Cause Existed

Having found a sufficient nexus, that the information provided in the affidavit was reliable, and that the information in the affidavit was not stale, the Court finds that there was sufficient probable cause to issue the search warrant for the Subject Residence. Because there was probable cause supporting the search warrant, the Court finds as moot the arguments based on *Leon*'s good-faith exception.

## II. Voluntariness

It is not disputed that the chicken coop was outside the scope of the search warrant. *See* Doc. 45 at 13; Doc. 49 at 24. Mr. Ramos-Castillo argues that the search of the chicken coop was unlawful because it was outside the scope of the search warrant and law enforcement officers did not obtain valid consent to search it. Doc. 45 at 13. He argues that all evidence derived from the search of the coop must be suppressed. *Id*. He asserts that any alleged consent on his part was coerced and therefore was not voluntary. *Id*. at 16. He argues that, pursuant to *Bumper v. State of North Carolina*, 391 U.S. 543 (1968), any consent could not be valid here because before any alleged consent was given, officers "stormed his home announcing they had a search warrant to search the premises." *Id*. at 18.

He argues that any alleged consent was not voluntary and was given under express coercion and duress because he was in handcuffs, physically injured, in pain and bleeding from a facial laceration, and was repeatedly threatened with damage to his property. *Id*. at 18–19. He asserts that he was not provided medical care despite complaints of pain, and maintains that agents repeatedly threatened to tear his property up in search of the evidence. *Id*. at 19–20. He argues that by the time he eventually agreed to take agents to where the drugs were located, he had been subjected to physical injuries, extreme psychological pressures, threats, promises, and coercion, all amounting to involuntariness. Doc. 73 at 12.

The government argues that there was no physical coercion and that Agent Godier was forced to subdue Mr. Ramos-Castillo for safety reasons and in compliance with department policy. Doc. 49 at 22. The government also asserts that no mental coercion was used, because Mr. Ramos-Castillo received *Miranda* warnings as soon as the agents began talking with him, and although some profanity and attempts at persuasion were used, "the amount of pressure necessary to overbear the will of another is necessarily high." *Id*. at 23 (citing *United States v. Jackson*, 608 F.3d 100, 103 (1st Cir. 2010)). The government also argues that Mr. Ramos-Castillo's reliance on *Bumper* is incorrect, because the Court there held that one cannot consent to search of his home where law enforcement has a warrant because that "announces in effect that the occupant has no right to resist the search." *Id*. at 23–24 (quoting *Bumper*, 392 U.S. at 550). Here, the officers were relying on the warrant to search the home, and it was only after Mr. Ramos-Castillo voluntarily led them to the chicken coop that they learned that the heroin was in an open field where a warrant was not required. *Id*. at 24. The government also argues that the agents knew early in the interrogation that there were drugs located on the property, as Mr. Ramos-Castillo made "multiple incriminating statements." Doc. 74 at 3.

Without a warrant issued upon a finding of probable cause, a search is "per se unreasonable…subject to only a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).  One of the well-settled, specifically established exceptions to the warrant and probable cause requirements is a search conducted pursuant to consent.  *Id.* (citing *Davis v. United States*, 328 U.S. 582, 593–94 (1946)).  Whether consent was voluntary or the product of duress or coercion is a question of fact that is to be determined by the totality of the circumstances.  *Id.* at 227.  The government bears the burden of proof in showing that "there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and voluntarily given."  *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994); *see also Bumper*, 391 U.S. at 547 ("When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.").

The Eleventh circuit has stated that "for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice."  *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).  In cases where there is a consensual search following a Fourth Amendment violation, the government bears the burden of proving that the consent was voluntary under the totality of the circumstances, and it must show a "break in the causal connection between the illegality and the evidence obtained."  *McCurdy*, 40 F.3d at 1119 (citing *United States v. Melendez-Garcia*, 28 F.3d 1053 (10th Cir. 1994)).

The Supreme Court has enumerated a list of factors to guide courts in considering the totality of the circumstances to determine "whether a defendant's will was overborne," examining both the individual's characteristics and the details of the interrogation:

> the youth of the accused, the lack of education, low intelligence, lack of any advice to the accused of his constitutional rights, length of the detention, repeated and prolonged nature of questioning, and the use of physical punishment such as the deprivation of food or sleep.

*Schneckloth*, 412 U.S. at 226. Determining whether a statement is involuntary requires "careful evaluation of all the circumstances of the interrogation." *Mincey v. Arizona*, 437 U.S. 385, 401 (1978).

The Tenth Circuit has announced a two-part test to guide an inquiry into the voluntariness of consent under the totality of the circumstances: the government must "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given,' and (2) the officers must have used no 'implied or express duress or coercion.'" *United States v. Taverna*, 348 F.3d 873, 878 (10th Cir. 2003) (citing *United States v. Sanchez*, 89 F.3d 715, 719 (10th Cir. 1996) (citation omitted)).

Regarding *Bumper*, the government is correct that it is not directly applicable to this context given that there was no warrant for the chicken coop. In that case, the petitioner lived with his grandmother, and when four officers arrived at her house and announced that they had a search warrant to search her house, she responded, "go ahead" and opened the door. *Bumper*, 391 U.S. at 546. The Court held that there is no valid consent when it is only given after the official who is conducting the search asserts that he has a warrant. *Id.* at 548. The government cannot discharge its burden of showing that any consent given was voluntarily and freely given by "showing no more than acquiescence to a claim of lawful authority." *Id.* at 548–49. The Court found that a law enforcement officer's announcement that he has authority to search under a warrant is essentially

an announcement that the "occupant has no right to resist the search." *Id*. at 550. The Court noted that such circumstances were coercive, and "[w]here there is coercion there cannot be consent." *Id*.

Here, the agents told Mr. Ramos-Castillo that they had a search warrant to search the whole property. Doc. 72 at 106. At the hearing, Agent Salcido testified that the agents were not asking Mr. Ramos-Castillo for permission to search, as they had a warrant which he believed to cover the whole property. *Id*. He testified that he was unaware at the time the warrant was executed that it did not cover the chicken coop. *Id*. Mr. Ramos-Castillo testified that he believed that the agents did in fact have a search warrant for the entire property. *Id*. at 185. He was told that the agents were "gonna search every little thing in here" and that they would "search every little piece of this residence and the, everything around here. Cuz that's what the warrant entails." Gov. Ex. 2a at 8, 19. Despite multiple requests to see the search warrant after the agents entered his home, the government concedes that it has no evidence that the warrant was ever shown to Mr. Ramos-Castillo. Doc. 74 at 14. Rather, a copy of it was left at the trailer on the dining table. *Id*.

While Rule 41(d) of the Federal Rules of Criminal Procedure requires federal officers to serve a copy of the warrant and receipt of the material obtained upon the person being searched, "it does not invariably require that this be done before the search takes place." *Katz*, 389 U.S. at 356 n.16 (citation omitted). The government argues that the agents' failure to provide a copy of the warrant to Mr. Ramos-Castillo is not prejudicial enough to require suppression of the evidence. Doc. 74 at 14. The government argues that here, his requests to see the warrant were merely to ensure that the agents had lawful authority to search the premises, "which would have only been confirmed if they had shown him the warrant." *Id*. at 15. The Court cannot agree with the government on this point, as had Mr. Ramos-Castillo been shown the warrant, he would have seen

that the warrant covered only his mobile home and the area immediately surrounding it, and not

his entire property including the chicken coop, as was communicated to him by the agents.

At the time the warrant was executed, Mr. Ramos-Castillo was only 23 years old, only had

a high school education and admitted that school had been difficult for him, and had no previous

contact with law enforcement. Doc. 72 at 167–68. There were approximately eight to ten officers

present, including DEA agents carrying weapons, NMSP officers, and Region III narcotics agents.

*Id*. at 16–17. Agent Salcido testified that upon entry, some agents had their long rifles, and

thereafter they still carried their side arms. *Id*. at 104.

It is not disputed that relatively quickly after entering Mr. Ramos-Castillo's residence, an

agent tackled him to the ground. The act of taking Mr. Ramos-Castillo to the floor caused the

glass portion of his entertainment center to shatter, resulting in shards of glass scattering all over

the floor. *See* Def. Exs. E, F, G. Agent Salcido testified that Mr. Ramos-Castillo was being neither

compliant nor combative, and accordingly they had to go "hands-on" with him. Doc. 72 at 20–21.

Mr. Ramos-Castillo testified that officers approached him immediately upon entering his home,

and did not wait for him to move. *Id*. at 173. He stated that he put his hands up and repeatedly

asked to see the search warrant, which was not provided to him, and at that point, Agent Godier

became physical and slammed him, causing his head to hit the entertainment center. *Id*. at 173–

74. The Court does not find any credible evidence that there was justification for the use of this

degree of force.

Mr. Ramos-Castillo was handcuffed immediately, as the officers were on top of him,

turning his face into the glass shards on the ground. *Id*. at 177. He suffered numerous cuts to his

head and hairline, and blood was dripping down his face. *Id*. at 174.; *see also* Def. Exs. G, H, H-

1. He testified that after being tackled, his head was throbbing as if he had a migraine, and he felt

pain in his shoulder and his knee as well, as he stated that his shoulder had slammed against the entertainment center and his knee slammed into the floor. *Id*. at 175, 178. Despite several bleeding cuts and numerous complaints of pain, the only medical attention he received was from Agent Pantoja, an EMT, who determined that no further examination or care was necessary. *Id*. at 38. He was promised by agents that he would get checked out for his injuries, seemingly in exchange for providing the location of the drugs. Gov. Ex. 2a at 16, 22 ("We're gonna get you checked out, bro. Just tell me where it's at so we can be done, bro.").

Mr. Ramos-Castillo was maintained in handcuffs throughout the entire encounter in spite of his complaints that his shoulder was in pain. Doc. 72 at 178. He was wearing only boxer shorts when the agents initially encountered him. *Id*. at 180. After being tackled to the ground hand handcuffed, the agents picked him up and put sweatpants on him. *Id*. at 181. He was not provided a shirt for the majority of the interrogation, until "the very end when they were already going to take [him] into the car," and the drugs had already been recovered. *Id*.; *see also* Def. Ex. H-1. The agents provided Mr. Ramos-Castillo shoes at the time that they were going to exit the trailer and go outside. *Id*. When he asked if they would tie his shoes, they not only refused, but told him that his shoes would end up coming off in jail anyway. *Id*.; *see also id*. at 85, Gov. Ex. 2a at 31.

Throughout the encounter, Mr. Ramos-Castillo was aggressively interrogated by several officers. There were a total of forty-five times throughout the interrogation that the agents asked or demanded that Mr. Ramos-Castillo take them to the drugs or show them where they were hidden. Def. Ex. T; Doc. 72 at 88–90; *see also* Gov. Ex. 2a at 17 ("right now, it's either you tell us where it's at in your house, or you and I are gonna go outside and the dogs are gonna tell us where it's at"); *id*. at 19 ("just tell me bro. it's over already."); *id*. at 30 ("Why, why are you, why are you resisting us?"). There were twenty-eight times that the agents threatened to destroy his

property or tear it up if he did not show them where the drugs were hidden. *Id*.; Doc. 72 at 102; *see also* Gov. Ex. 2a at 6 ("But if you're honest with us and you tell is where it's at, it saves you and it saves your house from being destroyed"); *id*. at 11 ("We have a warrant for it. So, you might as well just tell us, bro. That way we don't fuck up your pad."); *id*. at 16 ("I'm just giving you the opportunity so we don't have to tear up your house."); *id*. at 26 ("Tell us where it's at so we don't have to tear the shit outta this place…cuz we're gonna tear the shit outta this place if you don't"); *id*. at 27–28 ("rippin' seats out, pulling walls down…ripping everything out of the house…messing with your chickens, everything"). He was told that if he did not provide the location of the drugs to the agents, they would bring an excavator to his property to dig. Gov. Ex. 2a at 26 ("I'm tellin' you right now, this right here, this, it's done. So we don't wanna tear up your shit but guess what? I have an excavator on the way, we will start diggin' up. So…it's up to you."). He was also told numerous times that they would bring the search dogs. *Id*. at 7, 13, 17, 20, 23. Throughout the course of the interrogation, there were agents questioning Mr. Ramos-Castillo very close to his face. Doc. 72 at 199.

It was after 25 minutes of relentless questioning and threats that Mr. Ramos-Castillo succumbed to the pressure and led them to the location where the narcotics were stashed inside his chicken coop. *Id*. at 53, 111. The undisputed facts indicate that the chicken coop was outside of the scope of the warrant. However, Agent Salcido testified that the agents were not asking for permission to search. *Id*. at 106. Despite having a warrant, the agents chose to interrogate and pressure Mr. Ramos-Castillo into telling them the exact location of the drugs, rather than properly executing the warrant and searching the areas of the premises covered by the warrant. The agents wanted to quickly find the drugs and "be done"—get the job done and get home. Gov. Ex. 2a at 22, 30, 32 ("Cuz I gotta get my job done because I got a family at home waiting on me. So it's,

where is it at?  I'm not asking you to tell me where you got it, pretty much already know that.  I'm just asking you to tell me where it's at on this property.  It's easy, just say it.").

Under the Tenth Circuit's two-part test, it is the government's burden to prove that the consent was voluntary based on (1) a proffer of clear testimony that the consent was unequivocal and specific, and that it was freely and intelligently given, and (2) that the officers did not use any express or implied duress or coercion.  *Taverna*, 348 F.3d at 878.  Under the totality of the circumstances, the Court does not find that the government has met this burden.  Considering the totality of the circumstances and considering the factors set forth in *Schneckloth*, the Court finds that Mr. Ramos-Castillo was subjected to coercive police tactics, and accordingly finds that the statements he made were involuntary as was his decision to lead the agents to the location of the drugs in the chicken coop.

The government contends that Mr. Ramos-Castillo made statements early in the interview that led agents to believe there were drugs on the premises.  However, the first time he stated that there were no "illegal narcotics inside [his] house," he had not yet been provided his *Miranda* warnings.  Gov. Ex. 2a at 5.  He then made a similar statement, but only after he has already been threatened with the destruction of his house multiple times.  *See id*. at 6 ("It's better that you tell us because I have brought literally a cavalry, and we're gonna tear this place apart.") and ("But if you're honest with us and you tell us where it's at, it saves you and it saves your house from being destroyed.").

### III.    Inevitable Discovery Doctrine

The government argues that even if the Court finds in favor of Mr. Ramos-Castillo on any of the above-arguments, the evidence that Mr. Ramos-Castillo seeks to suppress would inevitably have been discovered by lawful means.  Doc. 74 at 12.  The government argues that the items

seized in the lawful execution of the warrant, in addition to the *Mirandized* statements that day, along with his decision to lead them to the drugs, all provided probable cause to obtain a second warrant to expand the scope of the search to include the surrounding land, including the chicken coop, which would have led to the inevitable discovery of the heroin. Doc. 49 at 30. The government points to several statements in which Mr. Ramos-Castillo implied that he had drugs hidden outside the trailer. *See id.* at 30–32("I don't have any illegal narcotics inside my house," and "I don't have anything inside my house."). By representing that he did not have drugs "inside the house," the agents, based on training and experience, believed that he most likely had drugs hidden outside on the property. *Id.* at 32. The government argues that the search of Mr. Ramos-Castillo's trailer and vehicle led to the seizure of other evidence of drug trafficking, including a loaded handgun, over $17,000 in cash, digital scales, an electric money counter, multiple cell phones, packaging materials, and ledgers. *Id.* The government argues that this seized evidence, his statements, and his decision to lead the agents to the chicken coop provided sufficient probable cause for a second warrant expanding the scope of the area to be searched, which would inevitably lead to the discovery of the heroin. *Id.*

Mr. Ramos-Castillo argues that the agents made no such effort to obtain a second warrant, and the information on which they claim they would have relied to obtain another warrant was obtained unlawfully, as his statements were not voluntary. Doc. 54 at 22. Outside of these involuntary statements, he argues, the government would be unable to show that it would have inevitably discovered the evidence. *Id.* He maintains that without the violation of his constitutional rights, the government would have no independent lawful means of discovering the evidence. *Id.* at 23. He contends that the inevitable discovery doctrine cannot be used as a way to circumvent the warrant requirement. *Id.* (citing *United States v. Echegoyen*, 799 F.2d 1271, 1280

n.7 (9th Cir. 1986) ("To excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment."); *United States v. Mejia*, 69 F.3d 309, 320 (9th Cir. 1995) (the inevitable discovery exception has never applied "so as to excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant")). He argues that the evidence the government relies upon to apply the doctrine was derived as a result of constitutional violations, including coercion to answer question resulting in an involuntary waiver of his Fifth Amendment rights. *Id*. at 24–25.

Evidence that is obtained illegally in violation of the Fourth Amendment should be suppressed under the exclusionary rule. *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014). The inevitable discovery rule is an exception to the exclusionary rule, that may allow evidence to be admitted. *Id*. For the evidence to be admitted, the government must "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). If the government can make that showing, then "the deterrence rationale has so little basis that the evidence should be received." *Id*. The government must show that the evidence would have been discovered without the Fourth Amendment violation. *Christy*, 739 F.3d at 540 (citing *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005)). The inevitable discovery doctrine "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings. *Nix*, 467 U.S. at 540 n.5. The Tenth Circuit in *United States v. Owens* reiterated a warning against "the danger of admitting unlawfully obtained evidence 'on the strength of some judge's speculation that it would have been discovered legally anyway'…" 782 F.2d 146, 152–53

(10th Cir. 1986) (quoting *United States v. Romero*, 692 F.2d 699, 704 (10th Cir. 1982) (citation omitted)).

The Tenth Circuit has previously stated that "[a]ll the cases that have endorsed the inevitable discovery exception have relied upon independent, untainted investigations that would have inevitably uncovered the same evidence." *Id*. at 152. The Supreme Court in *Nix* highlighted the "necessity of an *independent* investigation by delineating the close connection between the independent source rule and the inevitable discovery exception." *Id*. In *Owens*, the court found that an unconstitutional search of a bag in a motel room "trained the only police investigation that was ongoing," and it was clear that the officers were not conducting any independent investigation that would have led to the drugs that were recovered. *Id*. However, the Tenth Circuit has since clarified that the inevitable discovery exception does not require a second, independent investigation when the first investigation would inevitably have led to the discovery of the contested evidence by lawful means. *United States v. Streett*, 363 F.Supp.3d 1212, 1287 (D.N.M. 2018) (citing *Christy*, 739 F.3d at 540–41). Rather, the doctrine only requires that the lawful means of discovery is independent of the constitutional violation. *Id*. at 1288 (citing *United States v. Larsen*, 127 F.3d 984, 987 (10th Cir. 1997)).

In *Souza*, the Tenth Circuit adopted a four factor test for a warrantless search to determine the likelihood that a warrant would have been issued and that the disputed evidence would have been discovered pursuant to a warrant:

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

*Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000) (citing *United States v. Cabassa*, 62 F.3d 470, 473–74 (2d Cir. 1995) (internal quotations omitted)).

In *United States v. Cunningham*, a case involving fraudulent counterfeit checks, the Tenth Circuit assessed the applicability of the inevitable discovery doctrine where Mr. Cunningham had provided consent to search. 413 F.3d at 1200. On appeal, Mr. Cunningham argued that the totality of the circumstances amounted to duress and coercion such that his consent to search his home was involuntary. *Id*. at 1202–03. The Tenth Circuit declined to reach the issue of consent because it determined that inevitable discovery applied, thus supporting the denial of his motion to suppress. *Id*. at 1203.

The court assessed the four factors laid out in *Souza* to assess the warrantless search and determined that the inevitable discovery doctrine applied because without Mr. Cunningham's disputed consent, the warrant to search his house still would have been issued and the evidence would have been discovered. *Id*. at 1205. With respect to the first factor—the steps taken by law enforcement officers towards obtaining a warrant—officers had taken substantial steps to obtain a warrant prior to the contested search which indicated their intent to obtain a warrant: they narrowed their investigation down to two specific addresses with an adjoining driveway, drafted an affidavit in support of a search warrant for one of the homes, and determined that further surveillance was necessary and proceeded to conduct that surveillance immediately. *Id*.

With respect to the strength of the probable cause, the court noted that prior to the search, the officers already had background information about the alleged check-writing ring, narrowed their investigation to one block focusing in on two houses with a shared driveway, uncovered information during their surveillance including the vehicles parked at the residences and statements from the residents at one address that the traffic was coming from the home next door,

all amounting to sufficient probable cause for a search warrant prior to the disputed consent. *Id.* at 1204–05. With respect to the final two factors, the court noted that the officers did ultimately obtain a warrant, and that there was no evidence that the officers "jumped the gun" due to lack of confidence about probable cause and a desire to force the issue. *Id.* at 1205.

The instant case differs in that the agents did have a search warrant for the trailer and area immediately surrounding it, but the chicken coop where the drugs were ultimately recovered was outside the scope of this warrant. Like in *Cunningham*, there is a dispute as to whether Mr. Ramos-Castillo's consent to search the coop was voluntary. However, the government argues that there was sufficient probable cause to obtain a second warrant to expand the scope of the search to include the surrounding land, including the chicken coop. Doc. 74 at 13. Accordingly, the Court will assess the factors in *Souza*.

First, there is no evidence that the agents in this case actually intended to procure a second warrant to cover more of Mr. Ramos-Castillo's property. Rather, they tried to hurry through the process and repeatedly questioned him as to the location of the drugs and threatened the destruction of his property if he did not reveal the location until he finally showed them the location of the drugs and provided ostensible consent. Furthermore, the agents lead Mr. Ramos-Castillo to believe that the warrant covered the chicken coop. In *Souza*, the Tenth Circuit noted that the law enforcement officer alerted his office that he would be returning to prepare a warrant, and wanted to ensure that an affidavit form would be ready upon his arrival. *Cunningham*, 413 F.3d at 1204 (citing *Souza*, 223 F.3d at 1205)). While the officers here already had a search warrant for the specific GPS coordinates of his trailer, there is no indication that they intended to secure a second warrant.

With respect to the strength of the probable cause at the time the search occurred, the Court has already determined that probable cause existed to search the Subject Residence. *See supra* pp. 27–38. However, the question is whether probable cause existed to expand the search to cover the surrounding land on Mr. Ramos-Castillo's property. The government contends that such probable cause existed based on the items seized in the execution of the search warrant, the *Mirandized* statements made by Mr. Ramos-Castillo that day, and his decision to lead the agents towards the drugs. Doc. 74 at 13. The Court has already determined that the statements were coerced and thus not voluntary, *see supra* pp. 38–46, and accordingly Mr. Ramos-Castillo's statements and decision to lead the officers to the location of the drugs cannot provide a valid basis for probable cause for a second warrant.

The government points to the evidence that was seized from Mr. Ramos-Castillo's trailer and vehicle which are indicative of drug trafficking: a loaded handgun, over $17,000 in cash, digital scales, an electric money counter, multiple cell phones, packaging materials, and ledgers. Doc. 74 at 14. However, the Court finds that the only items from this list that were not obtained pursuant to statements made by Mr. Ramos-Castillo were the ledgers and packaging material. The gun was recovered when Agent Salcido asked where the gun was, and Mr. Ramos-Castillo responded that it was in the glove compartment. Gov. Ex. 2a at 31. The cash was located after Agent Madrid told Mr. Ramos-Castillo "if you got a large amount of money here, you better tell us now." *Id*. at 39. He responded that he had about fourteen or fifteen thousand dollars in a book box in his room. *Id*. at 39–40. Agent Madrid later asked what he had in addition to the cash in his box in the house, and he stated he did not believe he had other cash but that he had a scale in a box next to his pellet stove. *Id*. at 49. Mr. Ramos-Castillo then asked for his cell phone, which he described as a black iPhone in "the bag." *Id*. at 52. Agent Trujillo later told Mr. Ramos-Castillo:

"If you wanna help yourself out, you know, you did well by showing this agent where the, the drugs were, that's a start. By telling them where the money is at, that's a start. By telling 'em where the cuete (gun) is at, that's a start. But we wanna work up a little bit…" *Id*. at 63. Accordingly, the only evidence not clearly obtained through Mr. Ramos-Castillo's statements was the packaging material, ledgers, money counter, and possibly additional cell phones. Without more information about this evidence, and particularly what was contained in the ledgers, the Court is unable to find that there was sufficient probable cause to secure a second warrant based on the government's assertions.

As for the third factor, there is no evidence that a second warrant was ever obtained. As for the fourth factor, the agents did not appear to "jump[] the gun" because they lacked confidence in their showing of probable cause, as they already had a first warrant based on probable cause. However, they did "jump the gun" in their failure to properly execute the search warrant to recover evidence. Instead, they created a highly coercive situation and caused Mr. Ramos-Castillo to provide involuntary statements and consent, and conducted a search that exceeded the scope of the search warrant. Numerous statements made throughout the interrogation were indicative of the agents' desires to make the encounter quick and easy, rather than relying on the warrant to find the evidence they sought. Throughout the interrogation, there were multiple times that the agents told Mr. Ramos-Castillo to just "be done," or that they were done. *See* Gov. Ex. 2a at 11, 12, 18–19, 25, 29, 21. In fact, Agent Madrid told him, "Just tell us where it's at…Cuz I'm gonna be done soon, I'm gonna put you in the car. Cuz I gotta get my job done because I got a family at home waiting on me. So it's, where is it at?" *Id*. at 31. The agents could have executed the search and obtained the evidence that was discovered inside the trailer and the vehicle through the warrant process, but instead decided to employ coercive tactics to extract the information from an injured

and handcuffed individual. He was told that if he did not want to talk or provide information, he would be put in the police vehicle. *Id.* at 16 ("If you don't wanna talk about this shit, I have enough. I'll put you in a car and…hold you in there for right now and I will let the dogs do what they need to do."); *see also id.* at 7.

Here, it is not clear cut that the agents would have obtained a second search warrant and the drugs would have been found. In *Cunningham*, similar to *Souza*, the court found that but for Mr. Cunningham's mother's arrival at his home on the evening of the search, the officers would have obtained a search warrant. 413 F.3d at 1205. There, the Tenth Circuit reiterated what was emphasized in *Souza*: "[i]n most cases, the failure of the police to secure a warrant will probably be fatal." *Id.* (quoting *Souza*, 223 F.3d at 1206). The court said that it only applied the inevitable discovery doctrine in that case because it was "convinced" that without Mr. Cunningham's disputed consent, the warrant would have been issued and the incriminating evidence would have been discovered. *Id.* The court said it is appropriate for a court to apply the inevitable discovery doctrine "when it has a high level of confidence that the warrant in fact would have bene issued and that the specific evidence in question would have been obtained by lawful means." *Id.* at 1203 (quoting *Souza*, 223 F.3d as 1203). However, the Tenth Circuit has determined that inevitable discovery should not be applied based on a "highly speculative assumption of 'inevitability.'" *See Owens*, 782 F.2d at 153; *see also United States v. Shrum*, 908 F.3d 1219, 1235 (10th Cir. 2018) ("What would have transpired had the police not illegally seized Defendant's home from the outset and denied him access is anybody's guess."). Here, the government has not met its burden of pointing to non-speculative, "demonstrated historical facts capable of ready verification" that the drugs would inevitably have been discovered. *See Nix*, 467 U.S. at 444 n.5.

Accordingly, because the Court finds that the drugs recovered from the chicken coop were found pursuant to involuntary consent and the inevitable discovery doctrine does not apply, the drugs must be suppressed. However, while some of the evidence recovered from the trailer and vehicle were also found pursuant to coercive involuntary statements, they were covered within the scope of the search warrant and so the inevitable discovery doctrine dictates that these items are admissible. However, while this evidence may be admissible, the Court finds that it is too speculative to rely on this evidence, obtained pursuant to coerced statements, as a basis for probable cause to obtain a second search warrant, and therefore cannot provide a basis for the inevitable discovery of the heroin in the chicken coop.

### IV.     Open Field Doctrine

Mr. Ramos-Castillo argues that the chicken coop was part of the curtilage of his home where he had a reasonable expectation of privacy. Doc. 73 at 3. The government argues that the chicken coop qualifies as an "open field," which is not protected by the Fourth Amendment, so neither consent nor a warrant was required for the search of the chicken coop. Doc. 74 at 5–6. Because the Court has determined that Mr. Ramos-Castillo's statements and decision to lead the agents to the chicken coop were coerced and thus involuntary, and has further found that the inevitable discovery doctrine does not apply to the heroin recovered from the chicken coop, the Court need not reach the issue of whether the chicken coop qualifies as curtilage or an open field. Furthermore, the government conceded that the agents were unaware that the drugs were outside the scope of the search warrant until Mr. Ramos-Castillo led them to the location of the stashed drugs, which the Court has determined was done involuntarily. *See* Doc. 49 at 24 ("Law enforcement officers, when they asserted their authority to search the premises, were always relying on the search warrant and not the defendant's consent. They did not believe the heroin

was located outside the scope of the warrant, and only when defendant voluntarily led them to the chicken coop did they learn it was not within the curtilage of his home, but in an open field where a warrant was unnecessary."). Therefore, the agents did not find the heroin through lawful observations pursuant to the open fields doctrine, but rather through the coerced and involuntary consent provided by Mr. Ramos-Castillo.

## CONCLUSION

For the foregoing reasons, the Court finds that Mr. Ramos-Castillo has not made a showing that entitles him to a hearing under *Franks*, and accordingly his Supplemental Argument in Support of his Motion to Suppress [Doc. 77] is **DENIED**. The Court further finds that Mr. Ramos-Castillo's Motion to Suppress [Doc. 45] is **GRANTED** in part, in accordance with the above findings.

Dated this 26th day of September, 2019.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

Erlinda O. Johnson                          Matthew T. Nelson, Kristopher N. Houghton
*Attorney for Mr. Ramos-Castillo*          *Assistant United States Attorneys*